UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RENEE WEST, by next friend and parent, WILLIAM
C. WEST,

                Plaintiff,

     -v-

JAMES J. WHITEHEAD, Former Director of Hudson
Valley Developmental Disabilities Services Office;
ROGER MONTHIE, Former Deputy Director of
Hudson Valley Developmental Disabilities Services
Office; REGAN BENWARD, Supervisor of Bailey
Road House; ANN ADAMS, Supervisor of Bailey
Road House; and DAWN OFFERMAN,
Developmental Aide at Bailey Road House,

                Defendants.

---

Case No. 04-CV-9283 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Amanda Masters, Esq.
Gavin M. Kearney, Esq.
Marianne L. Engelman Lado, Esq.
New York Lawyers for the Public Interest
New York, New York
*Counsel for Plaintiff*

Jeffrey A. Trimarchi, Esq.
Clausen Miller, P.C.
New York, New York
*Counsel for Plaintiff*

Michael Berengarten, Esq.
O'Melveny & Myers LLP
New York, New York
*Counsel for Plaintiff*

Michael L. Spiegel, Esq.
New York, New York
*Counsel for Plaintiff*

Joseph J. Ranni, Esq.
Jacobowitz and Gubits LLP
Walden, New York
*Counsel for Defendant Dawn Offerman*

John F. Black, Esq.
Robert G. McCarthy, Esq.
Hinman, Straub, P.C.
Albany, New York
*Counsel for Defendants James J. Whitehead,*
*Roger Monthie, and Ann Adams*

Mark D. Rosenzweig, Esq.
New York State Department of Law
New York, New York
*Counsel for Defendants James J. Whitehead,*
*Roger Monthie, and Ann Adams*

Steven I. Milligram, Esq.
John D. Minehan, Esq.
Tarshis, Catania, Liberth, Mahon & Milligram
Newburgh, New York
*Counsel for Defendant Regan Benward*

KENNETH M. KARAS, District Judge:

On November 23, 2004, Plaintiff Renee West ("Plaintiff"), by her next friend and father,

William C. West, filed this lawsuit pursuant to 42 U.S.C. § 1983 ("Section 1983") against

Defendants James Whitehead ("Whitehead"), Roger Monthie ("Monthie"), Regan Benward

("Benward"), Ann Adams ("Adams"), and Dawn Offerman ("Offerman") (collectively,

"Defendants").  Plaintiff alleges that her constitutional rights were violated by Defendants when

she was subjected to various forms of abuse and neglect as a resident of the Bailey Road House

("BRH"), a state-operated facility for developmentally disabled individuals.

Defendants Whitehead, Monthie, and Adams, Defendant Benward, and Defendant

Offerman each has filed a Motion for Summary Judgment.  For the reasons stated herein, all

Motions are DENIED.

I. Background

A. The Parties

Plaintiff is a non-verbal individual with profound-range mental retardation.  From 1994 to 2004, Plaintiff resided at the BRH, which is a residence for developmentally disabled individuals and is operated by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD").  The BRH is within the jurisdiction of the Hudson Valley Developmental Disabilities Service Office ("HVDDSO"), which is a division of OMRDD.

Plaintiff requires twenty-four hour supervision and assistance with eating, dressing, bathing, shopping, and personal care.  Due to her incontinence, she has to wear a diaper and be placed on the toilet every couple of hours.  Though Plaintiff is non-verbal, she does vocalize by making an "aaying" sound at times.  Plaintiff sometimes demonstrates aggressive and self-injurious behavior, but this behavior has been largely controlled by psychotropic medications.  Plaintiff has an inability to protect herself from abuse or peer aggression or to communicate or report abuse, discomfort, fear, injury, or illness.  Therefore, it was necessary for the staff at the BRH to provide her with protection and "observe, report and address any apparent discomfort [Plaintiff] may have."  (Pl. Renee West's Omnibus Counterstatement of Facts in Opp'n to All Defs.' Mots. for Summ. J. ¶ 5 ("Pl.'s 56.1 Stmt").)

Plaintiff was a class member of the *Willowbrook Litigation*, which was a civil rights action "concerning the care and treatment of mentally retarded children and adults residing at Willowbrook State Developmental Center . . . ."  *See generally N.Y. State Ass'n for Retarded*

3

*Children v. Carey*, 393 F. Supp. 715 (E.D.N.Y. 1975) (hereinafter "*Willowbrook Litig. II*").

Pursuant to the *Willowbrook* consent decree, which was approved by the *Willowbrook* court in

1975 and aimed "to secure the constitutional rights of Willowbrook residents to protection from

harm," *id.* at 717, Plaintiff was assigned a Consumer Advisory Board ("C.A.B.") representative,

Linda Alvira. Ms. Alvira has been charged with "overseeing [Plaintiff's] quality of care,

reviewing, approving or disapproving [her] plan of care, including transfers between facilities,

medical, psychological and other care, and to advocate for [her] due process and other rights as

[a] Willowbrook class member[]." (Decl. of Linda Alvira in Opp'n to Defs.' Mot. for Summ. J.

¶¶ 3-4 ("Alvira Decl.").)

From October 1996 to September 2004, Defendant Whitehead served as Director of the

HVDDSO, directly supervising Defendant Monthie, who served as Deputy Director of the

HVDDSO.[1] The HVDDSO manages 130 community homes for over 1,000 people with

developmental disabilities, and the entire operation is overseen by Defendant Whitehead, with

the assistance of Defendant Monthie.

Defendant Adams worked at the BRH as a supervisor and developmental aide II from

1994 until November 6, 2003. Defendant Benward began working at the BRH on November 6,

2003, when she replaced Adams and began as a supervisor and developmental aide II, capacities

in which she still works today. Finally, Defendant Offerman worked as a developmental aide in

---

[1]There is some disagreement between the Parties about exactly when Defendant Monthie
acted as Deputy Director of the HVDDSO, such that his responsibilities would include oversight
of the BRH. (Aff. of Roger Monthie ¶¶ 5-6 ("Monthie Aff."); Pl. Renee West's Response to
Defs. Whitehead, Monthie and Adams Statement of Material Facts Pursuant to Rule 56 ¶¶ 24-25,
27 ("Pl.'s WM&A 56.1 Resp.").) However, Monthie appears to have acted as Deputy Director,
whose oversight responsibilities included the BRH, during most – if not all – of the time relevant
to Plaintiff's claims.

the BRH from August 2001 to December 3, 2003, and then again from May 2004 to September 2004.

B. Chain of Command & Abuse Reporting Procedures

Though Plaintiff disputes whether this chain of command was appropriately followed in practice, the chain of command for an individual home – such as the BRH – has been described as follows: "Developmental Assistant II or House Supervisor reported to a Developmental Assistant III; Developmental Assistant III reported to the Team Leader; Team Leader reported to Developmental Disability Program Specialist IV ("DDPS IV"); DDPS IV reported to the Deputy Director; Deputy Director reported to the Director." (Defs. Whitehead, Monthie and Adams Statement of Material Facts Pursuant to Rule 56 ¶ 20 ("WM&A 56.1 Stmt"); Pl.'s WM&A 56.1 Resp. ¶ 20.)

Pursuant to OMRDD policy, all consumer injuries that require more than first aid care are to be reported in a Form 147, which is then given to the Team Leader for the individual home.[2] (Aff. of James Whitehead ¶ 10 ("Whitehead Aff."); Monthie Aff. ¶ 10.) The Team Leader then investigates the incident and is supposed to issue a finding. If abuse is suspected by the Team Leader or any other employee, it must be "reported directly to the Director or Deputy Director's office by filling out a Form 147[]." (Response by Defs. Whitehead, Monthie and Adams to Pl.'s Counter Statement of Facts Pursuant to Rule 56 ¶ 21 ("WM&A 56.1 Resp."); Whitehead Aff. ¶ 10; Monthie Aff. ¶ 10.) In fact, pursuant to HVDDSO policy, as reflected on the "Record of Notifications" that accompanies Form 147, the Director or Deputy Director

_____

[2]Throughout their respective submissions, the Parties refer to the residents of the BRH as "consumers," so the Court adopts that terminology in this Opinion.

"[m]ust be called for all Serious Incidents and Allegations of Abuse during business hours."

(Decl. of Amanda Masters, Ex. 34, P000491 ("Masters Decl.").)  The filing of a Form 147

triggers the appointment of an investigator, whose findings are provided to the Quality

Assurance Division of the HVDDSO.  (Whitehead Aff. ¶ 10; Monthie Aff. ¶ 10.)  The

investigation is reviewed and, if necessary, further investigation is done by a Special Review

Committee, which will ultimately issue its own findings and conclusions.  (Whitehead Aff. ¶ 10;

Monthie Aff. ¶ 10.)

     Defendant Whitehead, as Director, and Defendant Monthie, as Deputy Director, were not

involved in each of the home's day-to-day operations; instead, such responsibility was delegated

to developmental aides, supervisors, and team leaders.  (Pl.'s WM&A 56.1 Resp. ¶¶ 19, 29;

Whitehead Aff. ¶ 7; Monthie Aff. ¶¶ 7-8.)  They relied on their staff and the Quality Assurance

Division to monitor individual homes, and they did not directly participate in investigations of

allegations of abuse, though they would receive notification of allegations of abuse, investigative

reports, and the findings and recommendations of the Special Review Committee following its

investigations.  (Masters Decl., Exs. 16, 28, 35-37; Dep. of Roger Monthie 108-09 ("Monthie

Dep.); Monthie Aff. ¶¶ 11-12; Whitehead Aff. ¶ 11.)  Unless there is some reason to suspect that

the Special Review Committee's recommendations would not adequately address the situation,

Whitehead would defer to its judgment.  (Whitehead Aff. ¶ 11.)[3]

_____

     [3]New York State Mental Hygiene Law imposes upon Defendants specific duties to
protect individuals like Plaintiff and to report abuse.  *See generally* N.Y. Comp. Codes R. &
Regs. ("N.Y.C.R.R.") tit. 14 §§ 624 ("Reportable Incidents, Serious Reportable Incidents and
Abuse in Facilities Operated or Certified by OMRDD"), 633 ("Protection of Individuals
Receiving Services in Facilities Operated and/or Certified by OMRDD").  The enunciated
purposes for such regulations are "to enhance the quality of care provided to persons with
developmental disabilities who are in facilities, to protect them (to the extent possible) from

C. Plaintiff's Allegations of Abuse and Neglect – Summary of Evidence

The facts surrounding the alleged incidents of abuse and neglect are highly disputed – demonstrating the inappropriateness of summary judgment here – so the Court will summarize the evidence before it below.

1. General Allegations of Abuse and Neglect

Plaintiff claims that throughout her ten years as a consumer at the BRH she was subjected to numerous incidents of abuse and neglect, and that her constitutional rights were thereby violated. (Compl. ¶¶ 78, 90-91, 102, 104.) According to Plaintiff, "she suffered numerous injuries that were caused either directly by the staff, by other consumers, by her own actions, or were of unknown origin." (Pl.'s Mem. of Law in Opp'n to Defs. Whitehead, Monthie and Adams Mot. for Summ. J. 5 ("Pl.'s WM&A Opp'n").) Plaintiff lists approximately fifty-nine incidents of alleged injuries she suffered while at the BRH for the time period spanning from April 1995 through November 2003, and she also describes some instances in which she was allegedly denied prompt and adequate medical treatment. (Pl.'s 56.1 Stmt ¶¶ 11, 13.)

Because the Court finds it unnecessary for purposes of the present Motion, the Court will not rehash all of the alleged incidents that Plaintiff claims to have contributed to violations of her constitutional rights. The fact that these injuries occurred, in most instances, is undisputed. Instead, the Parties disagree as to whether Plaintiff's constitutional rights were violated, and whether the individual Defendants sued herein can be held responsible for any of these injuries. For illustrative purposes, however, the Court will set forth the facts surrounding some of these incidents.

_____

harm, and to ensure that such persons are free from mental and physical abuse." *Id*. § 624.2(a).

One of the most eye-opening allegations involves the discovery in November 2000, of two handprints on Plaintiff's body. As a result, an investigation ensued, and the investigator concluded that an allegation of physical abuse was substantiated, though the perpetrator was never identified. (Masters Decl., Ex. 16.) The HVDDSO Special Review Committee also reviewed the handprint incident, concluding that Plaintiff was struck by a BRH staff member, but that the staff member's identity was unknown. (*Id.*, Ex. 17.)

Several months later, in February 2001, Plaintiff was taken to the hospital emergency room for unsteadiness, lethargy, facial abrasions, and bruising. (*Id.*, Ex. 18.) The hospital staff determined that Plaintiff had, among other issues, a bladder infection, for which a prescription was written. The failure of the BRH staff to send the prescription to the appropriate pharmacy resulted in Plaintiff not receiving treatment for the infection for thirty-six hours. (*Id.*, Exs. 18-19.) The incident was investigated, and the Special Review Committee determined that the staff's actions did not rise to the level of neglect, but rather constituted medication error. (*Id.*, Ex. 19.)

In November 2001, an allegation of neglect was found to have been substantiated when two staff members failed to follow a physician's instructions for them to take Plaintiff to the hospital for wrist X-rays, resulting in Plaintiff's wrist fracture going untreated for days. (*Id.*, Exs. 24-27.) This incident resulted in the filing of a Form 147 and an investigation by the Special Review Committee and HVDDSO, and the staff members involved were recommended for counseling. (*Id.*, Exs. 26, 27.)

Evidence in the record shows that Plaintiff was physically assaulted by another BRH consumer, "L.L.," on at least eight occasions from 2001 to 2003. (Pl.'s 56.1 Stmt ¶ 13; WM&A

56.1 Resp. ¶ 13.)  L.L.'s November 28, 2003 assault on Plaintiff caused the Special Review Committee to question whether the BRH consumers were being adequately supervised.  (Masters Decl., Ex. 29.)  As mentioned previously, the record is replete with evidence of other injuries suffered by Plaintiff, many – if not most – of which are of unknown origin.  (Pl.'s 56.1 Stmt ¶¶ 11, 13.)

The record also contains evidence that the BRH consumers, including Plaintiff, were not kept to their toileting schedules under Adams' supervision and, therefore, were left to sit in dirty diapers.  (Alvira Decl. ¶¶ 10, 14.)  For instance, Defendant Benward testified that when she started working at the BRH on November 6, 2003, she found that the consumers' toileting schedules were not being properly followed.  (Dep. of Regan Benward 108-12 ("Benward Dep.").)

Alvira, Plaintiff's C.A.B. representative, stated that the BRH was poorly managed by Defendant Adams, in that Adams "disregard[ed] consumer behavioral plans, foster[ed] poor morale and low expectations regarding the quality of care among her staff, [and] treat[ed] consumers in a punitive and harsh manner."  (Alvira Decl. ¶ 10.)  She explained that Plaintiff often appeared fearful while she resided at the BRH, by "pulling back, grimacing, [making] apprehensive facial expressions, flinching, and [engaging in] oppositional behavior."  (*Id*. ¶ 11.) According to Alvira, over the years, she made "many complaints" of abuse, neglect, and poor management at the BRH to Defendants Whitehead, Monthie, and Adams.  (*Id*. ¶ 12.)  Alvira found an "unusually high level of injuries to [Plaintiff] and to other residents" at the BRH, which she concluded, based on her experience, "can only result from direct physical abuse or neglectful care on the part of the Bailey Road staff."  (*Id*. ¶ 17.)  In fact, Alvira stated, "[i]n my experience,

I have never seen as many unexplained injuries to a consumer as [Plaintiff] suffered while at the [BRH]. . . . [T]his indicates either active abuse or neglect by Bailey Road staff, or both." (*Id.* ¶ 18.)[4]

### 2. Specific Allegations of More Recent Abuse and Neglect

#### a. Alleged Hairbrush Incident

Plaintiff alleges that on November 6, 2003, while she was riding in a van with Defendants Benward, Offerman, and Adams, Defendant Offerman threatened her with a hairbrush (the "alleged hairbrush incident"). (Compl. ¶¶ 45-48.) That day was Benward's first day and Adams' last at the BRH.

During her deposition, Benward testified that, while she was in a van with Plaintiff and Defendants Offerman and Adams, Plaintiff was "aaying" very loudly, that Offerman asked Adams, "[w]here is the brush?" and that Offerman grabbed the brush, held it up, and "showed" it to Plaintiff. (Benward Dep. 38, 40.) According to Benward, upon seeing the brush, Plaintiff "became quiet" and crossed her arms, though Benward testified that Plaintiff did not flinch and that Benward did not view Offerman's action as threatening at the time. (*Id.* 41-45.) When

_____

[4]Alvira also noted the following:

> Since [Plaintiff's] transfer [from the BRH], the incidence and frequency of [] injury to [Plaintiff] has dropped dramatically. [Plaintiff] has also shown a remarkable improvement in her behavior and demeanor. [Plaintiff] is generally more calm and cooperative. Whereas [Plaintiff] used to flinch defensively when approached at [the BRH], she is now less apprehensive and more likely to engage in physical contact, including hugs, with others. She also appears healthier, cleaner and more content.

(Alvira Decl. ¶ 28.)

asked how she interpreted Offerman's gesture of holding up the brush and showing it to Plaintiff, Benward stated, "I had no interpretation. I was brand new at the time." (*Id.* 43.) Benward testified that she never discussed this incident with Offerman. (*Id.* 45.)

On December 22, 2003, Defendant Benward filled out a Form 147, in which she described the alleged hairbrush incident. Benward wrote, "[w]hen [Plaintiff] saw the brush[,] she stopped ayeing and flinched and immediately sat back and away. While [Plaintiff] did this[,] she took her arms and wrapped them around her. [Offerman] didn't hit her with the brush, but it appeared that [Plaintiff] was afraid of the brush." (Masters Decl., Ex. 38.)

Defendant Adams testified in her deposition that she had no memory of Offerman asking for, grabbing, or holding up a hairbrush on November 6, 2003. (Dep. of Ann Adams 187 ("Adams Dep.").) Further, Offerman testified in her own deposition that she did not threaten Plaintiff with the hairbrush. (Dep. of Dawn Offerman 118-19 ("Offerman Dep.").) Offerman did, however, testify that she has seen Defendant Adams tell Plaintiff to be quiet and hit Plaintiff on the knee with the hairbrush a couple of times. (*Id.* 119-20.) In an audiotape recording of the December 18, 2003 interrogation of Offerman by HVDDSO Investigator Barbara Huff ("Huff"), Offerman stated that she had never seen anyone at the BRH use the hairbrush for any reason other than to make the consumers look presentable.[5] (Audio tape: State Investigator Barbara

---

[5]Offerman has objected to the Court's consideration of the transcript of this recording on two grounds: (1) the transcript, unsworn and unacknowledged by Offerman, lacks evidentiary value; and (2) the transcript, and the audiotape from which it was transcribed, was not properly provided to Offerman in discovery. (Letter from Joseph J. Ranni, Esq., to the Court, dated Nov. 7, 2007.) On April 30, 2008, the Court issued an Order, requiring Plaintiff to submit to the Court a copy of the audiotape recording for its consideration.

The Court here has either cited to the audiotape itself or has satisfied itself that the portions of the transcript relied on by the Court accurately represent what was said by Offerman and Huff during the interrogation. Further, the Court notes that, as a statement by a party-

Huff's Interview of Dawn Offerman, Track 1, 16:50 (Dec. 18, 2003).)

Huff recommended that Offerman "be referred to the Personnel Office for appropriate administrative action for psychological abuse . . . for threatening [Plaintiff] with the hairbrush on [November 6, 2003]." (Masters Decl., Ex. 28, RW-69.) It appears that this recommendation was based on statements made by Benward in the course of Huff's investigation of an allegation that Plaintiff was beaten with a plastic hanger on November 30, 2003 ("the alleged hanger incident"), which is discussed in detail below. (*Id.*, Ex. 28, RW-61-RW-62.) Huff also recommended that Benward be referred for administrative action for her failure to report this incident. (*Id.*, Ex. 28, RW-69.)

### b. Alleged Bib Incidents

Plaintiff alleges that on November 28, 2003, and December 1, 2003, Offerman gagged her with a bib while she was vocalizing (the "alleged bib incidents"). (Compl. ¶¶ 52, 57.) Offerman testified that she never gagged Plaintiff with a bib or tied a bib around her mouth in an abusive manner. (Offerman Dep. 130-31.)

Defendant Benward testified at her deposition that on November 28, 2003, when Offerman walked in to start her shift, Benward and Tina Wood ("Wood"), a developmental aide, were sitting together in the dining room at the BRH and Plaintiff was sitting in the living room.

---

opponent, Offerman's testimony during the interrogation would be admissible, either through the audiotape (as there is no reason to believe it cannot be properly authenticated) or through the testimony of Huff. *See* Fed. R. Evid. 801(d)(2)(A). The Court is also satisfied by the representations in Plaintiff's November 1, 2007 letter to the Court that the audiotape recording was made available to Offerman's counsel during discovery. (Letter from Amanda Masters to the Court, dated Nov. 1, 2007.)

Therefore, the Court rejects Offerman's objection to the Court's consideration of this transcript and audiotape.

(Benward Dep. 124-25.) Benward testified that she was looking down at some papers when Wood said to her, "Regan, that's a no-no." (*Id*. 125.) At that point, Benward looked up and "saw [Offerman] walking away from [Plaintiff] and there was a bib placed around her face [between her nose and mouth]." (*Id*.) According to Benward, she got "angry," walked into the living room, took the bib off of Plaintiff, and said to Offerman, "That's inappropriate. What are you doing? It's inappropriate. . . . If I hear or see it again, I will report this incident. . . . Don't do it again." (*Id*. 125, 127, 130.) She further testified that Plaintiff just sat there quietly when the bib was on her face and that Plaintiff did not seem to be discomforted by it. (*Id*. 126-27.)

According to Benward's testimony, she initially thought that Plaintiff may have placed the bib over her mouth herself, but she testified that her later belief that Offerman put the bib around Plaintiff's face was based on the fact that Wood said to Benward that it was a "no-no" and that Wood later told Benward that she saw Offerman place the bib around Plaintiff's face. (*Id*. 128-29, 132-33.) Benward further said that, while Offerman told Benward that the bib was placed on Plaintiff's mouth to stop her from drooling, Benward did not notice any drool on Plaintiff. (*Id*. 127-28.)

When asked at her deposition, "[d]o you think that tying a bib around [Plaintiff's] face constitutes abuse?," Benward responded, "[n]ow I do." (*Id*. 132.) When asked, "[w]hen [Wood] told you on the phone that [Offerman] tied the bib around [Plaintiff's] face, did you think that was abuse?," Benward responded, "[p]robably. I can't recall." (*Id*. 133.) Finally, when asked, "[d]o you think it's abuse now?," Benward said, "Yes." (*Id*.)

Benward claims that, on the day of this episode, she paged Scott Goldwasser ("Goldwasser"), the BRH Team Leader, to tell him what happened. (*Id*. 130.) He did not get

back to her that day, so she planned to talk to him four days later when she returned to work. (*Id.*)  Benward further testified that, at the time, she believed that paging Goldwasser and talking to Offerman about the proper way to put a bib on a consumer was the appropriate way to handle the situation because, "I didn't know these people.  I didn't know their behavior.  I didn't know their characteristics.  I didn't know anything about the consumers." (*Id.* 132.)  At her deposition, Benward admitted, however, that, after she spoke with Wood (which led her to "probably" believe that what Offerman did constituted abuse), she should have done the "procedure that we are supposed to do.  Call the AOD, get a replacement, have [Offerman] sent home." (*Id.* 134.)

On December 5, 2003, Tina Wood filled out an employee statement, in which she wrote that, on November 28, Offerman wrapped a bib around Plaintiff's mouth, causing Wood to say to Benward that it was a "no-no," and that "it's not right."  (Masters Decl., Ex. 39.)  Wood also wrote that she got up from the table at which she was sitting and pulled the bib off of Plaintiff's face.  (*Id.*, Ex. 39.)

During her deposition, Benward also testified that on December 2, 2003, another developmental aide, Mary Fields ("Fields"), told Benward that she saw Offerman tie a bib around Plaintiff's face.  (Benward Dep. 135-37.)  On December 2, 2003, Fields filled out an employee statement, writing:  "On Monday 12-1-03[,] I saw [Offerman] pulling a bib on [Plaintiff's] mouth. . . . I took the bib from her mouth.  I reported the incident to my director on Tues[day] morning 12-2-03."  (Masters Decl., Ex. 40.)  On December 9, 2003, Fields filled out another employee statement, this time with the HVDDSO, again stating that she had seen Offerman put a bib around Plaintiff's mouth and that Fields had removed it.  (*Id.*, Ex. 42.)

In the Incident Investigation Report created by Huff, she concluded that "[p]hysical

abuse to [Plaintiff] is . . . substantiated for two instances when a bib was tied over her mouth. Witnesses stated that on 11/28/03 and 12/01/03[, Offerman] tied a bib over [Plaintiff's] mouth when [Plaintiff] was vocalizing." (*Id*., Ex. 28, RW-68.)  Based on this conclusion, Huff recommended Offerman for administrative action. (*Id*., Ex. 28, RW-69.)  Huff also recommended Benward for administrative action based on her failure to report these incidents. (*Id*., Ex. 28, RW-69.)  On June 3, 2004, Defendant Whitehead issued to Offerman a "Non-Suspension Notice of Discipline" for two charges of "misconduct and/or incompetence" for "put[ting] a bib over consumer R.W.'s mouth." (*Id*., Ex. 43.)

c. Alleged Hanger Incident

Plaintiff alleges that, on November 30, 2003, Defendant Offerman beat with her with a plastic clothes hanger, causing Plaintiff physical and psychological harm. (Compl. ¶¶ 58, 68.) There were no eyewitnesses to this alleged beating, so Plaintiff relies entirely on circumstantial evidence to prove this claim.

Menessa Porter, a developmental aide who worked the November 29, 2003 night shift at the BRH (3:00 p.m. to 11:00 p.m.), submitted an employee statement in which she wrote that during her November 29 shift, she did not see any bruises on Plaintiff's body or hands (other than an old bruise on her right eye) and that she did not notice a hanger in the bathroom. (Masters Decl., Ex. 48.)

On November 30, 2003, Defendant Offerman worked at the BRH from 7:00 a.m. to 3:00 p.m. with Alice Mayshack ("Mayshack"), another developmental aide. According to Mayshack, she toileted Plaintiff once on November 30, 2003, before breakfast, and then she did not toilet

her again for the rest of the day.[6]  Mayshack claims that when she toileted Plaintiff that morning,

Plaintiff had no marks on her body.  (*Id.*, Ex. 50-51.)  Defendant Offerman claims to have not

toileted Plaintiff at all on November 30, 2003.[7]

At some point during that morning, Offerman was alone in the BRH with the consumers

while Mayshack went to the store, though it is unclear from the record for how long Mayshack

was gone.  (Offerman Dep. 142-43; Masters Decl., Ex. 50.)  According to Offerman, while

Mayshack was gone, Offerman was preparing and serving brunch to the consumers.  (Offerman

Dep. 142-43.)  At some point after Mayshack returned, Offerman left the BRH to go shopping at

Walmart and Shoprite and was gone for several hours.  There is some disagreement as to when

she returned.

On December 18, 2003, Offerman was interviewed by HVDDSO Investigator Barbara

Huff.  (Masters Decl., Ex. 7.)  During the course of that interview, Defendant Offerman denied

ever being alone with the consumers on November 30, 2003:

| | |
|---|---|
| MS. HUFF: | Did [Alice Mayshack] go out shopping? |
| MS. OFFERMAN: | No, I did the shopping. |
| MS. HUFF: | Did she leave the house at all? |
| MS OFFERMAN: | Not to my knowledge.  She was the only one there when I wasn't and I had the van. |
| MS. HUFF: | Before or after you went out, did [Mayshack] go out shopping? |
| MS. OFFERMAN: | No . . . [Mayshack] came downstairs and helped unload the van, put the groceries in the house and I unpacked them and by the time I was finished, it was 3:00. |

---

[6]The Court intends for its use of the terms "toilet," "toileting," and "toileted" to carry the same meaning as intended by the Parties in their use of those terms.

[7]The Court notes that, pursuant to Plaintiff's Individualized Service Plan, the BRH staff was required to toilet her every two hours.  (Masters Decl., Ex. 8; Adams Dep. 91.)

(Masters Decl., Ex. 7, 38.)  Though Offerman told Huff that Mayshack helped her unload the

van, she testified at her deposition that she unloaded the van herself and that she was "[a] little

bit" angry with Mayshack for not helping her.  (Offerman Dep. 174-75.)

On December 5, 2003, Defendant Offerman was questioned by Investigator Aniello

Moscato of the New York State Police about the alleged hanger incident.  When asked during

her deposition whether she prepared for that interview, Offerman testified that she did not

because she "didn't know what it was about." (*Id*. 113.)  Plaintiff finds significant the fact that

Offerman claims not to have known why she was being questioned by Investigator Moscato, but

she nonetheless brought the Shoprite and Walmart store receipts with her to the interview to

prove that she left the BRH at some point on November 30, 2003.  (Pl. Renee West's Mem. of

Law in Opp'n to Def. Dawn Offerman's Mot. for Summ. J. 16-17 ("Pl.'s Offerman Opp'n").)

Offerman claims to have had no physical contact with Plaintiff on November 30, 2003.

(Offerman Dep. 147, 149-50, 152-53, 156-57.)  According to Offerman, who was eight months

pregnant at the time, she avoided contact with Plaintiff to the extent that she could because

Plaintiff was violent at times and had previously kicked Offerman in the stomach.  (*Id*. 71-72.)

During her interview, Offerman told HVDDSO Investigator Barbara Huff that, after Plaintiff

kicked her in the stomach, Offerman told Defendant Adams that she would not deal with

Plaintiff when "she got in her moods."  (Masters Decl., Ex. 7, 43.)

Defendant Adams testified that Offerman never told her that Plaintiff kicked her in the

stomach, that Offerman worked with Plaintiff while Offerman was pregnant, and that Offerman

never spoke with Adams about not working with Plaintiff while Offerman was pregnant.

(Adams Dep. 118-19.)  Defendant Benward also testified that Offerman never told her that she

was kicked by Plaintiff. (Benward Dep. 103.)

Chris Kegler ("Kegler") and Fields, two developmental aides at the BRH, worked the November 30, 2003 nightshift (3 p.m. to 11 p.m.). In a supporting deposition that Kegler filled out with the New York State Police on December 2, 2003, Kegler stated that on November 30, 2003, while he was bathing Plaintiff, "[I] observed that she had red[d]ish marks on her buttocks. . . . I don't know for sure, but they appeared to have possibly been made by a plastic clothes hang[e]r. I had bathed [Plaintiff] the previous day and did not observe any markings." (Masters Decl., Ex. 46.)

Fields submitted an employee statement on December 9, 2003, in which she wrote, "Kegler asked me to come and observe red marks on [Plaintiff's] buttocks. . . . Hands were swollen . . . . [Kegler] and I [were] baffled as to what could have caused the marks. We both did notice[] a hanger (plastic) hanging on shower curtain rod in bathroom." (*Id*., Ex. 42.)

Benward testified that Fields called her at home at approximately 7:30 p.m. on November 30, 2003, to notify her of the injuries discovered by Fields and Kegler. (Benward Dep. 148-49.) According to Benward, Fields told her that Plaintiff's hands were swollen, but that Plaintiff has a history of edema (a condition that causes swelling), and that she had injuries on her buttocks, which "looked like a hanger mark." (*Id*. 149.) Benward asked if Plaintiff was in distress, to which Fields responded that she was not, and then Benward stated, "[w]ell, the nurses are coming tomorrow. Have them check it out." (*Id*.) Benward did not return to the BRH until December 2, 2003, and she did not speak with anyone regarding Fields' phone call before then. (*Id*. 154.)

Jackie Finikin ("Finikin"), a developmental aide, worked the November 30, 2003

graveyard shift (11 p.m. to 7 a.m.) with Wood. On December 10, 2003, Finikin submitted an employee statement regarding that shift, explaining, "[w]hen I took [Plaintiff's] diaper off . . . , I noticed some red circular marks on her hip and some discoloration on her buttocks, which I thought were impressions of the diaper because they did not appear to be welts. Her swollen left hand was noticed while she was eating breakfast." (Masters Decl., Ex. 45.)

On December 1, 2003, Defendant Offerman reported to work at the BRH. During her deposition, Offerman testified that she noticed Plaintiff's hands were swollen. (Offerman Dep. 183.) Offerman further testified that, upon discovering Plaintiff's swollen hands, she personally informed nurses Maryann Rutty ("Rutty") and Alfonse Rabino ("Rabino") and asked them to look at Plaintiff's hands. (*Id*. 185-86.) Offerman testified that she had never seen Plaintiff's hands swollen like that before. (*Id*. 187-88.)

Nurse Rutty submitted an employee statement on December 10, 2003, in which she wrote, "I noticed . . . on 12/1/03 that [Plaintiff's] hands were swollen. I b[r]ought this to the attention of [Nurse Rabino] and [Offerman]. [Offerman] explained that [Plaintiff] has a medical condition which causes her hands to swell. I looked through [Plaintiff's] chart but could not find any such condition noted." (Masters Decl., Ex. 56.)

When Benward came to work on December 2, 2003, she saw that Plaintiff's "hands were very swollen and bruised," and "a rash or a welt looking [sic] on her buttocks and the side on her hip." (Benward Dep. 137, 142.) Thereafter, Benward and Fields took Plaintiff to the hospital to have her hands x-rayed, but they did not show the doctor the injuries on Plaintiff's buttocks. (*Id*. 137, 147.) Instead, the next day, Benward was told to bring Plaintiff to a doctor to have the wounds on her buttocks examined. (*Id*. 147.)

On their way home from the hospital, Benward, Fields, and Plaintiff stopped at Wesley Day Hab to pick up the other BRH consumers. While there, Rose Buckley ("Buckley"), a developmental aide, toileted Plaintiff and discovered her injuries. (Masters Decl., Ex. 55.) Thereafter, Buckley notified the director of Wesley Day Hab, Peter Garney ("Garney"), about the injuries, and he called Team Leader Margaret O'Brien to initiate the abuse reporting procedure. (*Id.*, Exs. 54, 55.) According to the employee statement submitted by Garney on December 3, 2003, he inquired about Plaintiff's injuries to Benward, and she told him of her suspicion that the injuries were inflicted by an employee at the BRH, and he directed Benward to report the suspected abuse. (*Id.*, Ex. 55.) According to Benward, she asked Garney to notify O'Brien for her. (Benward Dep. 155-56.) After returning from the hospital on December 2, Benward started the notification procedure for Plaintiff's injuries by filling out forms, and calling the state police, personnel, and Plaintiff's social worker. (*Id.* 137, 155-56, 161-62.)

Defendant Benward filled out an employee statement on December 3, 2003, in which she explained that she received a phone call from Fields on December 1, 2003, notifying Benward of the marks that Kegler and Fields observed on Plaintiff's body. Benward also wrote that on December 2, 2003, when she returned to the BRH, she observed "welt marks" on Plaintiff's buttocks, bruising and swelling on Plaintiff's hands, and a bruise on Plaintiff's left arm. (Masters Decl., Ex. 52.)

The HVDDSO Special Review Committee investigated the November 30, 2003 incident and found that "[a]buse was substantiated." (*Id.*, Ex. 58.) The Committee found, "[w]hile it appears evident that someone struck [Plaintiff] with a plastic clothes hanger and there is reason to believe that Dawn Offerman was the assailant, without a witness to the incident it is difficult

to assign guilt." (*Id.*, Ex. 58.)

D. Procedural History

Plaintiff filed this lawsuit on November 23, 2004, alleging that her constitutional rights were violated while she was a resident at the BRH because she was subjected to a pattern of abuse and neglect.[8] According to Plaintiff, "defendants allowed plaintiff to be repeatedly abused and neglected over the years, culminating in an assault with a clothes hanger on or about November 30, 2003." (Compl. ¶ 2.) Plaintiff alleges that she was subjected to the following forms of neglect: "(1) lack of adequate psychological and medical services, (2) lack of sufficient direct-care and clinical staff to care for her appropriately, (3) lack of strong staff supervision and failures of oversight such as lack of body check logs, lack of reporting of behavioral issues, and lack of implementing plans for Plaintiff's care." (*Id.* ¶ 43.)

In her Complaint, Plaintiff alleges that Defendants violated her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. (*Id.* ¶ 70.)[9] Plaintiff alleges that her substantive due process rights were violated when she suffered physical and psychological harm by virtue of the abuse and neglect to which she was subjected at the BRH. According to Plaintiff, Defendants displayed deliberate indifference to her safety by allowing her vulnerabilities to be

---

[8]This case was originally assigned to the Hon. Richard C. Casey. On November 29, 2006, the case was reassigned to the Hon. Colleen McMahon. The case was reassigned to this Court on August 6, 2007.

[9]Defendants did not move for summary judgment on Plaintiff's Fourth Amendment claim. However, it is unclear to the Court the basis on which Plaintiff claims that Defendants violated her Fourth Amendment rights. Therefore, within two (2) weeks from the date of this Opinion, Plaintiff is to submit a letter to the Court, not to exceed three (3) pages, explaining why the Court should not dismiss Plaintiff's Fourth Amendment claim. Defendants will have one (1) week to respond.

exploited and permitting harm to befall her at the BRH.

On August 13, 2007, Defendants Whitehead, Monthie, and Adams filed a joint Motion for Summary Judgment. On the same day, Defendants Offerman and Benward each filed their own Motion for Summary Judgment. The Court held oral argument on July 23, 2008.

## II. Discussion

### A. Standard of Review

#### 1. Summary Judgment

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary

judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant]

must do more than simply show that there is some metaphysical doubt as to the material facts."

(internal quotation marks omitted)).

The materiality of the facts considered by the Court will be governed by substantive law.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the

Court is not charged with weighing the evidence and determining its truth, but with determining

whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit

Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990)*; see also Castro v. Metro. Transp. Auth.*, No.

04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006). A court's goal should be to

"isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

2. Section 1983

Section 1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To successfully assert a Section 1983 claim, a plaintiff must demonstrate:

"(1) that the challenged conduct was attributable at least in part to a person acting under color of

state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity

secured by the Constitution or laws of the United States." *Mitchell v. Dep't of Corr.*, No. 05-

CV-5792, 2008 WL 744041, at *9 (S.D.N.Y. Feb. 20, 2008) (internal quotation marks omitted).

The "'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'" *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.'

*Id*. at 127 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)) (alteration in original); *accord Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003); *Schiller v. City of New York*, No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986); *see also Fair*, 2006 WL 2801999, at *4 (citing *Bass*).

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut*, 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.*; *Fair*, 2006 WL 2801999, at *4.

Plaintiff has sued several individuals in this case, alleging that they are responsible for

deprivations of Plaintiff's constitutional rights.  Because personal involvement is an absolute

prerequisite to Section 1983 liability, the Court must determine whether Plaintiff has come forth

with sufficient evidence from which a reasonable jury could conclude that each of the named

defendants was personally involved – either directly or indirectly – in the deprivation of her

rights.

3. Fourteenth Amendment – Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides, "[n]o State shall . . .

deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend.

XIV.  The Supreme Court has described the Due Process Clause's "substantive component, [as]

forbid[ding] the government to infringe certain 'fundamental' liberty interests *at all,* no matter

what process is provided, unless the infringement is narrowly tailored to serve a compelling state

interest."  *Reno v. Flores*, 507 U.S. 292, 302 (1993) (emphasis in original).

There are two elements in a substantive due process claim:  "(1) identification of the

constitutional right at stake, and (2) consideration of whether the state action was arbitrary in a

constitutional sense."  *Bryant v. City of New York*, No. 99-CV-11237, 2003 WL 22861926, at *8

(S.D.N.Y. Dec. 2, 2003) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1984)); *accord*

*O'Connor v. Pierson*, 426 F.3d 187, 201-03 (2d Cir. 2005) (undertaking substantive due process

analysis, and first, identifying the constitutional right at stake and second, determining whether

the complained-of state action could be considered conscience-shocking).

With respect to the first element, a plaintiff is required to identify a constitutionally-

protected liberty or property interest that was compromised by the complained-of state action.

*See Conte v. County of Nassau*, No. 06-CV-4746, 2008 WL 905879, at *15 (E.D.N.Y. Mar. 31,

25

2008).  A substantive due process claim based on a liberty interest – such as the present one – "applies only to certain 'fundamental' liberty interests[, which include matters regarding] . . . individuals whose personal liberty was already constrained by state authority."  *Prospect Heights Action Coalition v. City of New York*, No. 02-CV-4693, 2002 WL 32096583, at *4 (E.D.N.Y. Oct. 22, 2002); *accord Reno*, 507 U.S. at 301-02 (describing those liberty interests entitled to protection under the substantive component of the Due Process Clause as "fundamental").

Once such an interest is identified, in order satisfy the second element, a plaintiff must show that he or she was deprived of that interest by constitutionally arbitrary or oppressive state action.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[T]he cognizable level of executive abuse of power [is] that which shocks the conscience.").  Indeed, "[s]ubstantive due process [only] protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised."  *Lowrance*, 20 F.3d at 537 (internal quotation marks and citations omitted); *accord Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (stating requirement that complained-of state action be "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense," not merely "incorrect or ill-advised"); *Conte*, 2008 WL 905879, at *14 n.12 ("A substantive due process claim is only viable where the government conduct of which the plaintiff complains shocks the conscience, violates the decencies of civilized conduct, and was intended to injure in some way unjustifiable by any government interest."  (quoting *Lewis*, 523 U.S. at 846, 849) (internal alterations and quotation marks omitted)).

"In order to shock the conscience and trigger a violation of substantive due process,

26

official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity . . . ." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks omitted) (ellipses in original). Further, it is well-established that the Due Process Clause is "not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (emphasis in original); *see also Lombardi*, 485 F.3d at 82 ("In gauging the shock, negligently inflicted harm is categorically beneath the threshold . . . ." (internal quotation marks omitted)).

Courts have acknowledged that those individuals in government custody – such as Plaintiff here – may be uniquely vulnerable to oppressive state action. Therefore, "many of the cases permitting recovery on a substantive due process ground for personal injury or death involve a person in state custody or under the state's control, [since s]uch persons are clearly subject to abuses of the government's significant power over them." *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986). In fact, the Second Circuit has observed that "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Doe v. N.Y. City Dep't of Soc. Servs.*, 649 F.2d 134, 142 (2d Cir. 1981); *accord DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the . . . Due Process Clause.").

The Supreme Court has held that mentally retarded individuals involuntarily committed

to state custody have constitutionally-protected liberty interests in "adequate food, shelter, clothing, . . . medical care[, and] . . . conditions of reasonable care and safety." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982).[10]  Relatedly, the courts also have held that individuals in state custody (such as foster children) have a constitutionally-protected right to be free from physical, psychological, and emotional harm.  *See, e.g.*, *Marisol A. v. Giuliani*, 929 F. Supp. 662, 674-75 (S.D.N.Y. 1996); *see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246-47 (2d Cir. 1984) (affirming district court's finding that resident plaintiffs' right to safe conditions was violated when insufficient supervision did not prevent plaintiffs from injuring themselves or being injured by others); *N.Y. State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F. Supp. 752, 764 (E.D.N.Y. 1973) (hereinafter, "*Willowbrook Litig. I*") ("One of the basic rights of a person in confinement is protection from assaults by fellow inmates or by staff.").  It bears remembering, however, that not all bodily harm caused by a government actor

---

[10]In *Youngberg*, however, the Court further instructed that "courts must show deference to the judgment exercised by a qualified professional." *Youngberg*, 457 U.S. at 322.  A "professional" is defined as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id*. at 323 n.30.  The Court continued that:

> interference by the federal judiciary with the internal operations of these institutions should be minimized.  Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.  For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id*. at 322-23 (internal citations omitted).

is actionable as a constitutional violation.  *See Lombardi*, 485 F.3d at 79 (citing *DeShaney*, 489 U.S. at 202).  Only when bodily harm is caused by government action "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," will a constitutional violation result.  *Id.* (internal quotation marks omitted).

Furthermore, the Second Circuit and other courts within the Second Circuit have interpreted *Youngberg* to apply to certain categories of people who are voluntarily committed to a state institution.  *See Cuomo*, 737 F.2d at 1246 ("[O]nce [the state] chose to house . . . voluntary residents, thus making them dependent on the state, it was required to do so in a manner that would not deprive them of constitutional rights. . . . Thus, [the] residents are entitled to safe conditions . . . whether they are voluntary or involuntary residents."); *McMahon v. Tompkins County Dep't of Soc. Servs.*, No. 95-CV-1134, 1998 WL 187421, at *3 (N.D.N.Y. Apr. 14, 1998) (finding that foster children have the same substantive due process right to be free from harm, regardless of whether they are voluntarily or involuntarily in foster care); *Kasunic v. Webb*, No. 89-CV-6802, 1990 WL 104005, at *6 (S.D.N.Y. July 16, 1990) (finding as nondispositive to plaintiff's federal constitutional claim the fact that her parents placed her in adult home for the mentally retarded "[g]iven plaintiff's mental incapacity and the illusory nature of 'voluntariness' in [such] situation[s]").

The Second Circuit also has held that individuals have a substantive due process right to be free from excessive force in the "non-seizure, non-prisoner context."  *See Johnson v. Leahy*, 239 F.3d 246, 253 (2d Cir. 2001) (internal quotation marks omitted); *accord Rodriguez v. Phillips*, 66 F.3d 470, 476-77 (2d Cir. 1995).  In determining whether a given action constitutes unconstitutional "excessive force," the following factors are considered:  "the need for the

application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson*, 239 F.3d at 251-52 (internal quotation marks omitted). As the Second Circuit has explained:

> If the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, then the conduct is presumptively unconstitutional. . . . [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. . . . [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Id.* at 252 (first alteration in original) (internal quotation marks omitted). Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances. *Id.* at 254 ("That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." (internal quotation marks omitted)).

### 4. Qualified Immunity

The doctrine of qualified immunity "shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As applied, the qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied:  '(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'"  *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (quoting *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir. 2002)); *accord Wilson v. Layne*, 526 U.S. 603, 614 (1999) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." (internal quotation marks omitted)).

The Second Circuit has held that "in order for a supervisor to be held liable under section 1983, both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established."  *Poe*, 282 F.3d at 126; *accord Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 352 (D. Conn. 2007) ("'The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.  This . . . is to say that in light of pre-existing law the unlawfulness must be apparent.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). With regard to the second inquiry, it "'must be undertaken in light of the specific context of the case,' and asks 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'"  *Atwood*, 468 F. Supp. 2d at 351 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (internal citations omitted).  The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular [] conduct. . . . Thus, if the court determines that the only conclusion a rational jury could reach is

that reasonable offic[ials] would disagree about the legality of the defendant's conduct under the circumstances, qualified immunity applies." *Poe*, 282 F.3d at 133 (internal quotation marks and citations omitted).

### B. Analysis

#### 1. Defendant Offerman

Plaintiff has identified Defendant Offerman as the "assailant" who personally inflicted physical and other abuse on Plaintiff while Plaintiff was a resident at the BRH. (Compl. ¶¶ 17, 48, 52-53, 57-58.) According to Plaintiff, Offerman violated her liberty interest in freedom from physical, psychological, and emotional harm by carrying out the alleged hairbrush, bib, and hanger incidents, in addition to speaking to Plaintiff in a harsh and punitive manner on numerous occasions. (Pl.'s Offerman Opp'n 5-11.)

Defendant Offerman argues that she is entitled to summary judgment in her favor on the following grounds: (1) Plaintiff has failed to produce evidence demonstrating that Offerman directly participated in the deprivation of Plaintiff's constitutional rights or that Offerman was the "assailant;" (2) Offerman cannot be held liable for the deprivation of Plaintiff's constitutional rights based on a theory of supervisory liability because Offerman had no supervisory authority; (3) Offerman is entitled to qualified immunity; and (4) Plaintiff's allegations do not rise to the level of constitutional deprivations. (Mem. of Law in Supp. of Def. Dawn Offerman's Mot. for Summ. J. 8-16 ("Offerman Mem.").)[11]

---

[11]With respect to Plaintiff's third and fourth claims (based, respectively, on Defendants' alleged failure to protect Plaintiff from harm and Defendants' violation of Plaintiff's right to adequate care and treatment), it is unclear to the Court whether Plaintiff intends to assert these claims against Offerman. This issue will need to be addressed at some point before trial.

<u>a. Personal Involvement</u>

As set forth more fully below, the Court finds there to be genuine issues of fact as to whether these incidents occurred, whether Offerman was the assailant, and whether these incidents violated Plaintiff's constitutional rights.  Though Plaintiff relies largely on circumstantial evidence, the Court finds that a reasonable jury could conclude that Plaintiff suffered conscience-shocking physical and/or psychological abuse at the hands of Defendant Offerman.  Therefore, Defendant Offerman's Motion for Summary Judgment is denied.

First, with respect to the alleged hairbrush incident, Defendant Offerman denies that she ever threatened Plaintiff with a hairbrush and insists that Plaintiff has no evidence demonstrating that she did.  (Offerman Mem. 11-12; Offerman Dep. 118-19.)  As evidence of the alleged hairbrush incident, Plaintiff relies almost entirely on statements made by Defendant Benward.

To support her claim that she did not threaten Plaintiff with a hairbrush, Offerman finds significant the facts that Benward testified at her deposition that she did not find Offerman's gesture with the hairbrush threatening, that Benward did not discuss the alleged hairbrush incident with Offerman, and that Benward did not mention the alleged hairbrush incident to anyone until after the alleged bib and hanger incidents took place.  (Offerman Mem. 11.)  As further evidence that she did not threaten Plaintiff with a hairbrush, Offerman points to Defendant Adams' deposition testimony that she had no memory of Offerman asking for, grabbing, or holding up a hairbrush on November 6, 2003.  (Adams Dep. 187.)

 The Court finds it difficult to reconcile Benward's deposition testimony that Plaintiff did not flinch at the sight of the hairbrush and that Benward did not find the alleged hairbrush incident threatening (Benward Dep. 41-45), with her earlier statement in December

2003, that Plaintiff immediately flinched at the sight of the hairbrush and appeared to be afraid of it (Masters Decl., Ex. 38). However, it is not for the Court to reconcile these seemingly inconsistent statements on summary judgment. Undoubtedly, Benward's previous statements and testimony regarding this incident will be presented to the jury, particularly when Benward testifies at trial. It is possible that upon hearing all of the evidence, the jury will choose to give more weight to the statements Benward made closer in time to the incident and when she had no incentive – such as the present lawsuit – to downplay the threatening nature of the incident or Plaintiff's reaction to it.

Of course, the jury will also be able to consider the testimony of Offerman and Adams and make the necessary credibility assessments. Therefore, the Court finds that there is a genuine issue of fact as to whether Offerman "showed" the hairbrush to Plaintiff in a threatening manner or because she knew Plaintiff was afraid of it. If the jury believes that Offerman showed the hairbrush to Plaintiff when Plaintiff was vocalizing, a reasonable jury could certainly find that it was done in threatening manner since Offerman testified herself that she had seen Adams hit Plaintiff with the hairbrush before. (Offerman Dep. 119-20.) Therefore, it would not be unreasonable for a jury to conclude that Offerman showed Plaintiff the brush knowing that Plaintiff might associate it with being hit and therefore be afraid to continue vocalizing. Drawing all reasonable inferences in Plaintiff's favor, the Court finds that a jury could also conclude that – in light of Plaintiff's disabilities and dependence on Offerman and other staff members – such a threat caused Plaintiff psychological and/or emotional harm.

Second, with regard to the alleged bib incidents, Plaintiff alleges that on November 28, 2003 and December 1, 2003, Offerman gagged her with a bib while she was vocalizing. (Compl.

¶¶ 52, 57.) Offerman denies this (Offerman Dep. 130-31), and argues that there is no evidence that she used a bib to "gag" or cause any injury or discomfort to Plaintiff. (Offerman Mem. 12-13.) She also argues that the fact that no one reported these incidents until December 2, 2003, undermines any claim that the alleged bib incidents were egregious or abusive. (Def. Dawn Offerman's Reply Mem. of Law 12 ("Offerman Reply").)

Though the Court does not know if the use of the word "gag" is accurate given the evidence relied on by Plaintiff, there is certainly a dispute of fact as to whether Offerman, on two occasions, inappropriately tied a bib around Plaintiff's mouth to stop her from vocalizing. This determination requires a credibility assessment of the various witnesses (Benward, Wood, and Fields) and Offerman, and Offerman will be free to raise the point of when the alleged bib incidents were reported for the jury's consideration. Therefore, it will be for the jury to decide whether Offerman improperly tied a bib around Plaintiff's mouth on two occasions, and whether, in so doing, Plaintiff was caused to suffer psychological and/or emotional harm.

Third is Plaintiff's claim that, on November 30, 2003, Defendant Offerman beat her with a plastic hanger. (Compl. ¶ 58.) Offerman argues that Plaintiff has come forward with insufficient evidence from which a reasonable jury could conclude that Offerman was the "assailant," or even that Plaintiff was abused with a hanger at all. There were no eyewitnesses to this alleged beating, so Plaintiff relies entirely on circumstantial evidence. This circumstantial evidence – discussed above – relies on Offerman's opportunity and motive to carry out the alleged assault, as well as certain inconsistent statements made by Offerman that, according to Plaintiff, demonstrate her consciousness of guilt as to the alleged hanger incident.

From the evidence presented by Plaintiff, the Court finds that a reasonable jury could

conclude that on November 30, 2003, during the 7:00 a.m. to 3:00 p.m. shift at the BRH, Plaintiff was abused with a hanger and that Defendant Offerman – one of the two people working that shift – was the person who carried out the assault, especially in light of the inconsistent statements she has made with regard to events of that day (most significantly, Offerman's inconsistent statements as to whether she was ever alone with the consumers on that day). The Court finds that based on this circumstantial evidence – when taken together and with all inferences drawn in Plaintiff's favor – a reasonable jury could conclude that Offerman beat Plaintiff with a hanger on November 30, 2003, and that the alleged hanger beating caused Plaintiff to suffer physical, emotional, and/or psychological harm.

Having determined that a reasonable jury could conclude that Defendant Offerman threatened Plaintiff with a hairbrush, improperly placed a bib on her face while she was vocalizing on two occasions, and beat her with a hanger, the Court must now determine whether a reasonable jury could conclude that such actions violated Plaintiff's due process rights. With respect to the first element of the substantive due process analysis, the courts have held that someone in Plaintiff's position has a liberty interest in reasonably safe conditions and freedom from physical, emotional, and psychological harm, *see Youngberg*, 457 U.S. at 324; *Marisol A.*, 929 F. Supp. at 675, and freedom from excessive force unjustified by any legitimate government purpose, *see Johnson*, 239 F.3d at 253. Thus, taking the evidence in the light most favorable to Plaintiff, Plaintiff has satisfied this element.

With respect to the second element, if the alleged incidents occurred as Plaintiff claims, the Court finds that a reasonable jury could conclude – taking into consideration Plaintiff's vulnerable state, her complete dependence on the BRH staff members, and her inability to

defend herself or report any abuse that she suffers – that any conduct which takes advantage of these facts and causes her substantial harm shocks the conscience, and therefore, violated Plaintiff's constitutional rights. Indeed, a reasonable jury could conclude that Offerman's alleged conduct was carried out only for the purpose of causing harm, that there existed no legitimate governmental purpose for the conduct, and that the conduct caused Plaintiff to suffer substantial physical and psychological injury. *See Lewis*, 523 U.S. at 848 (stating "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"); *accord Johnson*, 239 F.3d at 252 (explaining "force [that is]'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and [that] results in substantial emotional suffering or physical injury, . . . is presumptively unconstitutional" (second alteration in original)).

### b. Qualified Immunity

Defendant Offerman argues that, even if the above incidents did occur as alleged, she is entitled to qualified immunity for her actions "because no evidence demonstrates Offerman violated any of Plaintiff's constitutional rights." (Offerman Mem. 16.)

The Court finds it unnecessary to spend much time on this argument, having already decided that a reasonable jury could conclude that Offerman violated Plaintiff's constitutional rights to be free from excessive force and physical, psychological, and emotional harm, rights which have been clearly established for some time. *See Youngberg*, 457 U.S. at 324 (right to reasonable care and safety); *Johnson*, 239 F.3d at 253 (holding "the right to be free of excessive force as announced by this court in *Rodriguez* was sufficiently concrete to put [defendant] on

notice that he could not use intentionally harmful force in the absence of a legitimate and discernable government aim"); *Marisol A.*, 929 F. Supp. at 675 (right to freedom from physical, emotional, and psychological harm); *Willowbrook Litig. I*, 357 F. Supp. at 764 ("One of the basic rights of a person in confinement is protection from assaults by fellow inmates or by staff."). Further, if Plaintiff is able to substantiate to a jury her allegations of abuse by Offerman, the Court finds it difficult to envision Offerman making any credible argument that it was objectively reasonable for her to believe that she could threaten and beat Plaintiff without violating Plaintiff's well-established rights. Therefore, Offerman's Motion for Summary Judgment based on qualified immunity is denied.

### 2. Defendant Benward

Benward's first day as a supervisor at the BRH was November 6, 2003, the day of the alleged hairbrush incident. According to Plaintiff, "Benward personally witnessed two acts of clear abuse committed by Defendant Dawn Offerman, a staff member who[m] Benward was responsible for supervising, and was notified by members of her staff of two other acts of abuse committed by Offerman[, but d]espite this, Benward failed to take corrective action to protect Renee West from further harm and as a result this abusive pattern continued." (Mem. of Law in Opp'n to Def. Benward's Mot. for Summ. J. 1 ("Pl.'s Benward Opp'n").)

Defendant Benward argues that she is entitled to summary judgment in her favor on the following grounds: (1) there is insufficient evidence to support a claim that Benward was personally involved in a deprivation of Plaintiff's constitutional rights; (2) there is insufficient evidence that Benward was on notice that Plaintiff's constitutional rights were being violated at the BRH; and (3) Benward is entitled to qualified immunity for her reasonable decisions based

on what she knew at the time.  (Mem. of Law in Supp. of Def., Regan Benward's, Mot. for Summ. J. 6-11 ("Benward Mem."); Reply Mem. of Law in Supp. of Def., Regan Benward's, Mot. for Summ. J. 10-13 ("Benward Reply").)

For purposes of evaluating Defendant Benward's Motion for Summary Judgment, the Court assumes – for reasons noted above – that a reasonable jury could conclude that Defendant Offerman violated Plaintiff's constitutional rights by threatening her with a hairbrush, tying a bib around her face on two occasions, and beating her with a hanger.

### a. Personal Involvement

The first question for the Court with respect to Defendant Benward – Offerman's supervisor at the time of the alleged incidents – is whether a reasonable jury could conclude that she was personally involved in the deprivation of Plaintiff's constitutional rights.  As noted above, "[a] supervisor may not be held liable under Section 1983 merely because his subordinate committed a constitutional tort."  *Poe*, 282 F.3d at 140.  However, if a plaintiff can show that a supervisor demonstrated deliberate indifference with regard to a high risk that his or her subordinate would violate plaintiff's rights and that supervisor's neglect actually caused the violation of plaintiff's constitutional rights, Section 1983 liability for the supervisor can be established.  *See id.*; *see also Amnesty Am. v. W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) ("[P]laintiff['s] evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." (internal quotation marks and citation omitted)).  Therefore, the relevant inquiry here is whether

there exists a genuine issue of fact as to whether Benward "knew or should have known that there was a high degree of risk that" Offerman would abuse Plaintiff – either physically, emotionally, or psychologically – and that Benward "deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to" Plaintiff. *See Poe*, 282 F.3d at 142.

To premise liability on deliberate indifference, courts – taking into consideration all of the surrounding circumstances – have to make "closer calls" than when liability is based on intentional conduct. *See Lewis*, 523 U.S. at 850 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking."); *see also Amnesty Am.*, 361 F.3d at 128 ("The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence." (internal quotation marks omitted)).

Though Benward was new to the BRH at the time of the alleged incidents, she received training on the administrative investigation of abuse allegations when she first started working for the HVDDSO, and she received annual "refresher" courses on the topic. (Benward Dep. 46-47.)[12]  Further, HVDDSO policy made it clear that Benward was required to report any suspected

---

[12]During oral argument, Plaintiff's counsel stated that Benward started working for the State of New York in 1989, demonstrating that she had "fourteen years of training on how to properly detect and handle abuse."  (Hr'g Tr., July 23, 2008, 69.)  Though the Court was unable to find a precise start date for Benward's employment with the State in the record, her counsel did not dispute Plaintiff's counsel's representation that it was in 1989, so the Court assumes, for

abuse that she heard of or witnessed herself, even if she did not believe it actually constituted

abuse.  (Masters Decl., Ex. 34, P000468.)[13]

   Plaintiff argues that, based on the incidents Benward witnessed and the substantial abuse

training she received, a reasonable jury could conclude that Benward, after witnessing the

alleged hairbrush incident and the first alleged bib incident (both of which preceded the alleged

hanger incident and the second alleged bib incident), was on notice of the risk that Offerman was

violating Plaintiff's constitutional rights.  Thus, Benward's subsequent failure to report or

otherwise remedy these suspected violations could be interpreted by a reasonable jury as

demonstrating deliberate indifference to Plaintiff's rights and as contributing to the further

violation of Plaintiff's rights by Offerman.

   With respect to the alleged hairbrush incident, Benward argues that this single act did not

raise her suspicions, especially because it was not physically violent and she was new at the

BRH.  (Benward Mem. 4.)  Further, according to Benward, the first alleged bib incident was not

_____

purposes of this Motion, that date to be accurate.

   [13] The 2003 edition of the HVDDSO Staff Development and Training booklet provides:

> If you see abuse happening, PROTECT and ASSIST THE
> VICTIM. . . . If you suspect abuse because someone tells you
> something or you see suspicious evidence or behavior REPORT IT
> IMMEDIATELY to your supervisor, or if appropriate, your team
> leader or the administrator on duty.  Report it even if you [d]o not
> believe that there was abuse.  This documentation protects you
> from the charges of 'covering up' the evidence and it supports you
> and others against future false allegations by that person.  YOUR
> FAILURE TO IMMEDIATELY REPORT ABUSE,
> MISTREATMENT OR NEGLECT CAN RESULT IN CHARGES
> AGAINST YOU OF NEGLECT.

(Masters Decl., Ex. 34, P000468.)

physically violent and, for all Benward knew at the time, Plaintiff could have placed the bib around her mouth herself. (*Id*. 5.) She further points out that rather than do nothing in response to the alleged bib incident, she immediately counseled Offerman about the proper way to put a bib on a consumer. (*Id*.) Benward argues that "it is beyond dispute, other than retrospectively, that these two disparate and remote events did not and could not provide [her] with adequate notice such that she was obliged to regard these as abuse." (*Id*.)

Though the Court appreciates Benward's point that she was new at the BRH in November and December 2003, and that she did not know what to make of the conduct she was observing, this point is better made to a jury, which will be able to consider it along with the evidence that suggests Benward, who received years of training in recognizing and reporting abuse, did in fact find Offerman's alleged behavior to be abusive at the time. For instance, Benward was equivocal as to whether, at the time, she thought the first alleged bib incident constituted abuse. (Benward Dep. 133 ("Probably. I can't recall.").) Also, a reasonable jury could determine that Benward's claim that, for all she knew at the time, Plaintiff could have put the bib on herself improperly is inconsistent with Benward's testimony that she got "angry" with Offerman, told Offerman that her conduct was "inappropriate," and threatened to report the incident if she saw Offerman do it again. (*Id*. 125, 127, 130.) Furthermore, a reasonable jury could question why Benward's employee statement regarding the alleged hairbrush incident painted a slightly, but not insignificantly, different picture than Benward's deposition testimony as to how threatening the incident was or how Plaintiff reacted to it. Lastly, a reasonable jury could reject Benward's claim that she was too new to the BRH to recognize Offerman's conduct as abusive, particularly in light of her training.

Thus, the Court finds that a reasonable jury could conclude that, after witnessing the alleged hairbrush and bib incidents, Benward was on notice of a risk that Plaintiff was being abused by Offerman and that Benward acted deliberately indifferent to that serious risk. The Court believes that a reasonable jury also could conclude that there is a causal link between Benward's failure to report these incidents and the deprivation of Plaintiff's rights by Offerman through the second alleged bib incident and the alleged hanger incident. A reasonable jury might decide that had Benward reported Offerman's misconduct, Offerman would have been removed from the BRH or at least not permitted to be alone with any of the consumers until Benward's suspicions could be investigated. Such safeguards could have protected Plaintiff from the abuse she is alleged to have suffered later.

Having already decided that a reasonable jury could conclude that Benward was deliberately indifferent to a risk that Plaintiff was being abused by Offerman, the Court believes that, under the circumstances of this case, which necessarily require consideration of Plaintiff's vulnerability to abuse, her inability to report abuse, and her dependence on others, like Benward, to protect her, such indifference can be found by a reasonable jury to shock the conscience.

### b. Qualified Immunity

As noted above, the "qualified immunity defense is established when (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe*, 282 F.3d at 133 (internal quotation marks omitted).

Courts have clearly established the legal principles that protect Plaintiff from physical and psychological harm and excessive force and had done so at the time of the alleged incidents.

The Court concludes that laws requiring Benward to provide for Plaintiff's reasonable care and safety were also clearly established at the time of the alleged incidents. *See Youngberg*, 457 U.S. at 324 (right to reasonable care and safety); *Willowbrook Litig. I*, 357 F. Supp. at 764 (right to protection from assault by fellow inmates and staff members). Given Benward's undisputed knowledge of Plaintiff's disabilities and inability to protect herself or report abuse and Benward's supervisory role in the BRH, the Court finds that Benward's constitutionally-based responsibility to provide for Plaintiff's safety and well-being was clearly established. *See Youngberg*, 457 U.S. at 324 (mentally retarded individuals in state custody "enjoy[] constitutionally protected interests in conditions of reasonable care and safety"). In fact, there were clear rules in place for reporting *suspected* abuse at the BRH, and these rules warned that persons who failed to properly report abuse could become personally accountable for neglect. (Masters Decl., Ex. 34, P000468.) Therefore, the Court finds that if Benward was on notice that Offerman may have been abusing Plaintiff – physically or otherwise – her alleged failure to properly report or otherwise remedy the abuse violated Plaintiff's clearly-established rights to reasonably safe conditions and protection from harm.

Next, the Court considers whether Benward acted in an objectively reasonable manner in her response – or lack of response – to the alleged hairbrush and bib incidents. Because the Court has already determined that a reasonable jury could conclude that Benward demonstrated deliberate indifference to Plaintiff's constitutional rights by failing to report these incidents in a timely fashion, this Court will not at the same time conclude that Benward's conduct was objectively reasonable. *See Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994) ("Assuming that [defendant] was deliberately indifferent to [plaintiff's] serious medical needs, he is not

entitled to qualified immunity because it would not be objectively reasonable for him to believe his conduct did not violate [plaintiff's] rights."); *Hallett v. N.Y. State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 202 (S.D.N.Y. 2000) (holding "defendants could not have been deliberately indifferent and objectively reasonable at the same time").

However, aside from the fact that the Court is satisfied that a reasonable jury could find deliberate indifference on Benward's part, the Court independently concludes that Benward's conduct following the alleged incidents of abuse was not objectively reasonable under the circumstances. Though Benward was new at the BRH, Plaintiff was entitled to Benward's protection of her constitutional rights from day one. Because there is evidence in the record suggesting that Benward suspected that Offerman's conduct towards Plaintiff was abusive at the time, the Court is unwilling to find Benward needed to become a seasoned veteran of the BRH to recognize potentially abusive conduct and therefore that her failure to take any action was objectively reasonable as a matter of law.

Therefore, Benward is not entitled to qualified immunity and her Motion for Summary Judgment is denied.

### 3. Defendants Whitehead, Monthie, and Adams

With respect to Defendants Whitehead, Monthie, and Adams, Plaintiff alleges that throughout her time as a resident at the BRH, her constitutional rights to "basic standards of human decency, including prompt and adequate medical care, necessary elements of basic hygiene, freedom from physical, psychological, emotional and developmental harm, abuse and neglect, and adequate supervision to prevent self-injury and assault by other residents or staff" were violated, and that despite Defendants' actual knowledge of these deprivations, they did

nothing to forestall or correct the deprivations.  (Pl.'s WM&A Opp'n 1-2.)

In their joint Motion for Summary Judgment, Defendants Whitehead, Monthie, and Adams argue that they are entitled to summary judgment in their favor on the following grounds: (1) Plaintiff has not established that she was deprived of a constitutional right by an actor acting under color of state law;[14] (2) they were not personally involved in the alleged constitutional deprivations; and (3) they are entitled to qualified immunity.  (Mem. of Law in Supp. of Mot. for Summ. J. on Behalf of Defs. Whitehead Monthie and Adams 7-16 ("WM&A Mem.").)

### a. Defendant Adams

Plaintiff argues that Adams was personally involved in the deprivation of her constitutional rights because Adams was "present at the residence during numerous instances of injury to [Plaintiff] from self-abuse, assault by other consumers, and outright physical abuse and neglect by staff[, and despite] her actual knowledge and pre-existing duties to [Plaintiff], Adams did nothing to forestall or correct these incidents."  (Pl.'s WM&A Opp'n 1.)  Further, Plaintiff argues that Adams' supervision was "replete with instances of delayed medical treatment, improper administration of medication and unhygienic care, and defined by gross mismanagement and an overall failure to meet basic needs of [Plaintiff]."  (Id.)

Thus, according to Plaintiff, Adams' personal involvement can be premised on her direct involvement in constitutional deprivations, her knowledge of and failure to remedy constitutional

---

[14]Defendants Whitehead, Monthie, and Adams do not argue that Plaintiff's allegations fail to rise to the level of constitutional deprivations; instead, they argue that Plaintiff failed to demonstrate that her rights were violated by a state actor.  Because the Court finds, for reasons stated above, that a reasonable jury could conclude that Plaintiff's constitutional rights were violated by state actors while she was a resident at the BRH, this argument is rejected and the Court assumes, for purposes of this Motion, that – at least some, if not most, of – Plaintiff's allegations rise to the level of constitutional deprivations.

violations, her gross negligence and deliberate indifference despite her knowledge of constitutional violations, and her creation of a policy or custom under which unconstitutional practices were allowed to continue. (*Id*. 30-32.) The Court will not explore each of these claims because it is satisfied that a reasonable jury could find that Adams was personally involved in the deprivation of Plaintiff's constitutional rights based on her deliberate indifference to Plaintiff's rights.

Defendant Adams claims that, during her tenure at the BRH, she never witnessed Plaintiff being abused. (Aff. of Ann Adams ¶ 17 ("Adams Aff.").)[15] Moreover, Adams, along with Whitehead and Monthie, claim that Plaintiff's list of injuries demonstrate Plaintiff's "proclivity to engage in aggressive and self-abusive behavior." (WM&A 56.1 Resp. ¶ 13.) In fact, all three Defendants take the position that it was Plaintiff's aggressive, self-abusive tendencies that injured Plaintiff, not their actions or inactions.[16]

However, the Declaration submitted by Alvira paints a different picture of the BRH as managed by Adams – one where Plaintiff suffered many injuries, as a result of abuse and

_____

[15]With regard to the alleged hairbrush incident, Adams claims not to recall Offerman "brandishing a brush in a threatening manner" as is alleged by Plaintiff. (Adams Aff. ¶ 15.) Given Defendant Benward's testimony about the alleged hairbrush incident, a reasonable jury would be charged with weighing Adams' credibility to determine whether she was in fact aware of what Offerman was doing and ignored it. It suffices to say here, that a jury could find that Adams did observe the threatening conduct by Offerman.

[16]The Court finds this argument – one of the permeating themes in Defendants' moving papers – entirely unpersuasive, as the Second Circuit has recognized that a failure to protect certain individuals from self-injury can, in the right circumstances, give rise to a constitutional claim. *See Cuomo*, 737 F.2d at 1246 (approvingly citing district court's finding that custodial plaintiffs' rights to safe conditions were violated when insufficient supervision did not prevent plaintiffs from injuring themselves). Therefore, the claim that some – or even many – of Plaintiff's injuries were self-inflicted does not mean that Defendants are entitled to summary judgment on these facts.

neglect, and was denied basic hygiene, such as having her diaper changed in a timely manner. (Alvira Decl. ¶¶ 10, 12, 14, 16-19.)  Alvira also states that she spoke with Adams regularly about Alvira's concerns with Plaintiff's care and about the injuries from which Plaintiff was suffering. (*Id.* ¶¶ 8-9, 12-13.)

Plaintiff argues that Adams exhibited deliberate indifference to her rights by failing to act on information that constitutional wrongs were occurring.  In her Affidavit, Defendant Adams states the following:  "[a]s a result of Plaintiff's disorders, she was predisposed to suffering injuries.  Therefore, I had come to expect that Plaintiff would suffer various injuries."  (Adams Aff. ¶ 10.)  This statement was no doubt included in support of Adams' Motion for Summary Judgment to convince the Court that Plaintiff's various injuries resulted, not from Defendant Adams' various actions or inactions, but from Plaintiff's own afflictions.  The Court, however, reads this statement – and the attitude it reflects – as being potentially problematic for Adams, a supervisor who was charged with providing Plaintiff with a reasonably safe and secure environment.  *See Youngberg*, 457 U.S. at 324.  This statement, combined with Alvira's testimony and Plaintiff's other evidence of the litany of injuries Plaintiff suffered over the course of her years at the hands of BRH staff, could lead a reasonable jury to conclude that Adams deprived Plaintiff of her constitutional right to a reasonably safe environment by turning a blind eye to the source of Plaintiff's injuries.  The law demands more of those charged with protecting the most vulnerable in our society.  *See id.*; *Cuomo*, 737 F.2d at 1246 (affirming district court's finding that custodial plaintiffs' rights to safe conditions were violated when insufficient supervision did not prevent plaintiffs from injuring themselves or being injured by others); *Willowbrook I Litig.*, 357 F. Supp. at 764 (finding the right to protection from assaults by fellow

inmates and staff members one of the "basic rights" held by individuals in state custody); *Willowbrook II Litig.*, 393 F. Supp. at 718 (referring to court's earlier determination that, in the context of mentally retarded individuals in state custody, "there was a constitutional right to protection from harm, even in respect of persons who confinement was not involuntary"). The Court appreciates the fact that Adams may not have been able to protect Plaintiff from all of the harm alleged, but the Court finds that a reasonable jury could conclude – based on all the evidence – that Adams displayed deliberate indifference to Plaintiff's rights by not doing anything to remedy the violations, though she had actual notice that they were occurring.

Whether deliberately indifferent conduct is conscience-shocking is context-driven, *see Lombardi*, 485 F.3d at 82, and the Court is satisfied that a reasonable jury could conclude that Adams' deliberate indifference to Plaintiff's constitutional rights was conscience-shocking under the circumstances, which, again, include the facts that Plaintiff is unable to care for or protect herself and that Plaintiff was completely dependant on Adams and her staff to take care of her and to protect her from harm.

### b. Defendants Whitehead & Monthie

Defendants Whitehead and Monthie argue that Plaintiff failed to establish a causal link between their alleged inactions and Plaintiff's alleged constitutional injuries, and that Plaintiff has not demonstrated that Defendants Whitehead and Monthie had sufficient notice that Plaintiff's constitutional rights were allegedly being violated so as to establish supervisory liability. (WM&A Mem. 9.)

Plaintiff argues that Defendants Whitehead and Monthie were personally involved in the deprivation of her constitutional rights to "personal security and safe conditions, medical care

and necessary elements of basic hygiene, and freedom from psychological and developmental harm," (Pl.'s WM&A Opp'n 33), because "there is substantial evidence that [they] had both actual and constructive knowledge of the ongoing deprivations and failed to remedy them, that [they] perpetuated the ongoing constitutional deprivations and were grossly negligent in or deliberately indifferent to the administration of their duties," (*Id*. 39). Further, Plaintiff claims that "based on [Whitehead and Monthie's] inability to forestall the numerous and repeated incidents of injury, abuse and neglect, and to detect the obvious need for supervision, it may also be inferred that [they] created and/or allowed for the continuance of a policy or custom under which unconstitutional practices occurred." (*Id*.)

According to Plaintiff, Defendants Whitehead and Monthie had actual knowledge that her constitutional rights were being violated at the BRH because, through the HVDDSO reporting system, they received reports of suspected abuse and neglect at the BRH, and Alvira claims to have spoken or written directly to Defendants Whitehead and Monthie about concerns that Defendant Adams was not properly managing the BRH and that the BRH consumers were being abused and neglected. (Pl.'s WM&A Opp'n 33-34; Alvira Decl. ¶¶ 12-13, 16, 20-21, 25.)[17] Though Alvira does not set forth explicitly what she said to Whitehead and Monthie and

_____

[17]Alvira states that she "consistently advocated for improved care at [the BRH] beginning shortly after [Plaintiff's] arrival in 1994." (Alvira Decl. ¶ 12.) According to Alvira, she and the Executive Director of C.A.B., Rita Martin ("Martin"), "made *many* complaints up the chain of command over the years regarding abuse, neglect, and poor management issues at [the BRH]. We complained directly to Defendant Adams, to other employees who reported up the chain of command to Defendants Monthie and Whitehead, as well as *directly* to Monthie and Whitehead." (*Id*. (emphasis added).) Further, she states "[o]n several occasions from 1997 through 2003, I notified Adams and her superiors, including James Whitehead and Roger Monthie, about my concerns with the care provided at [the BRH], and particularly with the house director, Ann Adams." (*Id*. ¶ 13.)

when she did so, the Court is satisfied, for purposes of this Motion, that she communicated to them her view that the residents at the BRH were being abused and neglected under Adams' supervision.

Defendants point out – and the Court recognizes – that "[r]eceipt of letters or grievances . . . is insufficient to impute personal involvement." *Woods v. Goord*, No. 01-CV-3255, 2002 WL 731691, at *7 (S.D.N.Y. Apr. 23, 2002). The Court further recognizes that "[b]road, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient to impose liability." *Vega v. Fox*, 457 F. Supp. 2d 172, 182 (S.D.N.Y. 2006). However, Defendants did not merely receive letters, and Plaintiff does not rely solely on her own allegations of notice. Instead, in Alvira's Declaration, she states that she and her supervisor, Rita Martin, personally contacted Whitehead and Monthie repeatedly over a period of several years, seeking remedial action for what they believed to be constitutional deprivations at the BRH. For example, in 1997, Alvira and Martin met with Monthie to discuss their many concerns with the BRH, including their view that "Adams was managing the house poorly" and that "the residents were not being properly cared for." (Alvira Decl. ¶ 16.) In 1998, Alvira and Martin met with Whitehead to discuss "the continuing problems with the care at [the BRH]" and their belief that "Adams was managing the house poorly," as well as, more specifically, the numerous injuries and gasoline poisoning suffered by Roy Thomas ("Thomas"), a BRH consumer from March 1994 to February 1998. (*Id.* ¶ 21.)[18] Whitehead and Monthie were also both copied on a letter

---

[18]Plaintiff also submitted to the Court the Affidavit of Eleanor Murphy ("Murphy"), Roy Thomas' sister. In the Affidavit, Murphy details the abuse and neglect she claims that Thomas suffered as a consumer at the BRH, explaining that:

> I informed the state about the conditions at [the BRH] because I

that Alvira sent to a member of the HVDDSO on December 18, 2000, complaining about the

lack of psychological services available to Plaintiff at the BRH.  (*Id.*, Ex. C.)

Therefore, the Court finds that Plaintiff has sufficient evidence from which a reasonable

jury could conclude that Defendants Whitehead and Monthie had actual knowledge – primarily

through Alvira's efforts – that Plaintiff's constitutional rights were being violated under the

supervision of Adams at the BRH.[19]  *See Woods*, 2002 WL 731691, at *10 (finding sufficient

knowledge on the part of defendant because beyond receiving letters and grievances, outside

professionals appealed directly to defendant about deprivations of plaintiff's constitutional

rights).

---

> was worried about the safety of the other consumers living there,
> including Renee West.  I told Whitehead and Monthie all of my
> concerns about the pattern of neglect and abuse that Roy had
> endured while he lived there, and my suspicions about the staff,
> including Annie Adams.

(Aff. of Eleanor Murphy ¶ 35 ("Murphy Aff.").)

Murphy also sent a letter to a member of HVDDSO administration, who forwarded the letter to Whitehead.  In the letter, she wrote, "I feel this group home needs to be investigated not only for my brother but for the safety and well being of all the consumers who reside there."  (*Id.* ¶ 34.)

The Court notes the contents of this Affidavit only show that there exists evidence in the record that Whitehead and Monthie were made aware of a potentially systematic problem at the BRH under Adams' supervision, and that such a systematic problem could have resulted in harm to Plaintiff.

[19]In the alternative, Plaintiff argues that – regardless of whether Defendants Whitehead and Monthie had actual notice – they are charged with constructive notice of abuse and neglect based on Defendants' alleged failure to satisfy their pre-existing duties under New York Mental Hygiene Law regulations.  (Pl.'s WM&A Opp'n 37 ("To the extent that these incidents may have occurred without Whitehead and Monthie having notice, it is their failure to fulfill their duties that caused the lack of actual notice.  In such circumstances, defendants are charged with constructive notice.").)  Because there is evidence to suggest that Defendants Whitehead and Monthie had actual notice, it is unnecessary for the Court to address this argument.

Alvira states that "[d]espite my repeated contacts with the HVDDSO administration, including James Whitehead and Roger Monthie, I did not witness any substantial or lasting changes at the [BRH] with respect to [Plaintiff's] care." (Alvira Decl. ¶ 27.) However, the Court notes that Alvira did testify that some actions were taken in response to her complaints, though it is unclear when these actions were taken and who initiated them. (Alvira Dep. 312-13.)[20] The Court finds that there are issues of fact as to whether, having received reports that Plaintiff's constitutional rights were being violated at the BRH, Defendants Whitehead and Monthie did nothing to remedy the violations, and thereby exhibited deliberate indifference to Plaintiff's rights. There are further issues of fact as to whether their inactions caused Plaintiff constitutional injury because they deprived her of her constitutional right to a reasonably safe

_____

[20]During her deposition, Alvira was asked whether anything was ever done by the individuals to whom she complained about the BRH and Adams (Alvira Dep. 312), and she testified that "[o]n occasion, certain things would be done to attempt some follow-up. . . . A body-check log. There was extra supervision given to Ann Adams by a superior staff person, extra team leader visiting and involvement for supervision purpose," (*id*. 313). When asked who ordered the extra supervision, Alvira responded that it could have been the team leader, the team leader supervisor, or from someone even higher up in the chain of command. (*Id*. 313.) Moreover, the record supports Plaintiff's claim that she continued to suffer abuse even after implementation of the body-check log.

Thus, this evidence suggests that Alvira's complaints may not have fallen on completely indifferent ears, as Plaintiff claims, even though Plaintiff may view the response as inadequate. *See Reynolds v. Giuliani*, 506 F.3d 183, 196 (2d Cir. 2007) ("Any inadequacy that may be found in the state's response stands in sharp contrast to the allegations of inaction and even encouragement of misconduct that provide grounds for supervisory liability in the typical case. State defendants did not sit on their hands in the fact of an obvious need to act.").

It is unclear from Alvira's testimony, however, whether these actions were taken by or at the direction of Whitehead or Monthie, or when they were taken in relation to Alvira's many complaints. Therefore, there remains an issue of fact as to whether Whitehead and Monthie acted with deliberate indifference.

environment by permitting the dangerous and unclean conditions at the BRH to continue.[21]

Defendants Whitehead and Monthie explained in their affidavits and depositions that they relied on the chain of command and reporting by employees, consumers' family members, and C.A.B. representatives to bring problems to light and remedy them. (Whitehead Aff. ¶¶ 7, 9, 11, 14; Monthie Aff. ¶¶ 8, 12, 15; Whitehead Dep. 35-36, 49; Monthie Dep. 45, 103, 108-09, 137-38.) Whitehead acknowledged at his deposition that he was ultimately responsible for disciplining supervisors, like Adams (Whitehead Dep. 27), and that poor supervision can come to light through the "active supervision" of supervisors (*id.* 30). He further explained that if a house supervisor failed to promptly report abuse and neglect, it would deprive the consumers in the house of a prompt response to the issue and would delay the implementation of protective measures, such as additional supervision or, in more serious circumstances, separating the alleged abuser from the consumers. (*Id.* 49-51.)

Given the size of the operation they were charged with overseeing, it is understandable that Defendants Whitehead and Monthie relied heavily on the chain of command and reporting to uncover suspected cases of abuse and neglect. Indeed, Whitehead and Monthie argue that

---

[21]Plaintiff argued that Defendants Whitehead and Monthie's personal involvement can be premised on the fact that they allegedly violated their duties under N.Y.C.R.R. §§ 624 and 633 because they failed to implement systems that tracked a pattern or trend of injuries to a particular home, problems with supervision, incidents where abuse was substantiated but the perpetrator was not identified, or incidents of abuse by employee or residence. (Pl.'s WM&A Opp'n 39.) Plaintiff claims that Defendants' failure to adopt such tracking systems demonstrates their deliberate indifference and gross negligence. The Court has determined that there exists sufficient evidence from which a reasonable jury could conclude that Defendants Whitehead and Monthie acted with deliberate indifference based on their actual knowledge of potential abuse and neglect, so the Court does not reach Plaintiff's argument that Defendants' alleged failure to comply with their pre-existing duties under New York Mental Hygiene Law also amounted to a constitutional violation.

they were justified in relying on the reporting and investigative procedures they had in place to uncover and deal with suspicious incidents in Plaintiff's care, citing cases such as *Greene v. Mazzuca*, 485 F. Supp. 2d 447, 452 (S.D.N.Y. 2007) (finding no personal involvement for supervisor who relied on the administrative complaint procedure that was in place). (WM&A Reply 6-7.) However, Alvira's numerous complaints directly to Whitehead and Monthie about Adams and the living conditions at the BRH might lead a reasonable jury to conclude that, with respect to the BRH, Defendants Whitehead and Monthie were put on notice that the reporting procedures and chain of command they were relying on had failed to uncover and remedy unconstitutional conditions at the BRH and that more action was needed to protect the BRH residents.[22] Their alleged failure to take any action to protect Plaintiff's rights even though they were receiving repeated reports from Alvira that Adams and her staff were violating Plaintiff's constitutional rights and that Plaintiff was being abused and neglected at the BRH, could lead a reasonable jury to conclude that Defendants Whitehead and Monthie exhibited deliberate indifference to Plaintiff's rights. Once again, given Plaintiff's vulnerability and her ultimate dependence on Defendants Whitehead and Monthie, there is an issue of fact as to whether, under these unique circumstances, they displayed conscience-shocking deliberate indifference.

---

[22]Defendants Whitehead and Monthie did not argue that they were qualified professionals, whose judgment, under *Youngberg*, is entitled to a great amount of deference from the Court. The Court notes that it is possible – yet not entirely clear from the record – that they would be appropriately termed qualified professionals based on their respective experience running the HVDDSO. Without record evidence of what other professionals in their positions would deem an appropriate response to the information they were given, the Court is unwilling to grant Defendants' Motion on the ground that their judgment was not "a substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323.

### c. Qualified Immunity

With regard to Defendants Whitehead, Monthie, and Adams' claims for qualified immunity, Plaintiff maintains that "[i]n light of Plaintiff's clearly established rights, objectively reasonable state employees simply could not have believed that the gross failure to protect Renee West at Bailey Road House, the failure to effectively deal with abusive and neglectful supervisors and employees, and the participation in her abuse and neglect were justified." (Pl.'s WM&A Opp'n 41.) Because the Court has determined that a reasonable jury could conclude that Defendants Whitehead, Monthie, and Adams exhibited deliberate indifference to Plaintiff's rights, which were clearly established at the time, the Court is unwilling to conclude that Defendants Whitehead, Monthie, and Adams' actions (or, more accurately, inactions) were objectively reasonable under the circumstances. *See Hallett*, 109 F. Supp. 2d at 202 (holding "defendants could not have been deliberately indifferent and objectively reasonable at the same time").

With respect to Defendants Whitehead and Monthie, given that Alvira's complaints seem to have at least partly focused on Adams as a poor manager, it was arguably unreasonable for Defendants Whitehead and Monthie to assume that the normal chain of command would work to remedy any problems at the BRH since they were given actual notice that one of the links in the chain – Adams – was actually causing, or at least being indifferent to, the problems.

Therefore, Defendants Whitehead, Monthie, and Adams are not entitled to qualified immunity and their Motion for Summary Judgment is denied.

### III. Conclusion

For the reasons stated herein, Defendant Offerman's Motion for Summary Judgement is DENIED; Defendant Benward's Motion for Summary Judgment is DENIED; and Defendants Whitehead, Monthie, and Adams' Motion for Summary Judgment is DENIED. Plaintiff has two (2) weeks from the date of this Opinion to submit a letter to the Court, not to exceed three (3) pages, explaining why the Court should not dismiss Plaintiff's Fourth Amendment claim. Defendants will then have one (1) week to respond. The Clerk of Court is respectfully directed to terminate the pending Motions (Dkt. Nos. 46, 50, 51).

SO ORDERED.

Dated:      September 10, 2008
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (By ECF):

Amanda Masters, Esq.
Gavin M. Kearney, Esq.
Marianne L. Engelman Lado, Esq.
New York Lawyers for the Public Interest
151 West 30th Street 11th Floor
New York, NY 10001
Email: amasters@nylpi.com
       gkearney@nylpi.com
       mlado@nylpi.com
*Counsel for Plaintiff*

Jeffrey A. Trimarchi, Esq.
Clausen Miller, P.C.
One Chase Manhattan Plaza
New York, NY 10005
Email: jtrimarchi@omm.com
*Counsel for Plaintiff*

Michael Berengarten, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Email: mberengarten@omm.com
*Counsel for Plaintiff*

Michael L. Spiegel, Esq.
111 Broadway, Suite 1305
New York, NY 10006
Email: mikespieg@aol.com
*Counsel for Plaintiff*

John F. Black, Esq.
Robert G. McCarthy, Esq.
Hinman, Straub, P.C.
121 State Street
Albany, NY 12207
Email: johnb@hspm.com
       robertm@hspm.com
*Counsel for Defendants James J. Whitehead,*
*Roger Monthie, and Ann Adams*

Mark D. Rosenzweig, Esq.
New York State Department of Law
120 Broadway, 24th Floor
New York, NY 10271
Email: Mark.Rosenzweig@oag.state.ny.us
*Counsel for Defendants James J. Whitehead,*
*Roger Monthie, and Ann Adams*

Steven I. Milligram, Esq.
John D. Minehan, Esq.
Tarshis, Catania, Liberth, Mahon & Milligram
One Corwin Court
Post Office Box 1479
Newburgh, NY 12550
Email: smilligram@tclmm.com
        jminehan@dsltc.com
*Counsel for Defendant Regan Benward*

Joseph J. Ranni, Esq.
Jacobowitz and Gubits LLP
158 Orange Avenue
Post Office Box 367
Walden, NY 12586
jjr@jacobowitz.com
*Counsel for Defendant Dawn Offerman*